# Wytheville.

## CITY OF NORFOLK v. CHAMBERLAIN.

### June 30th, 1892.

1. MUNICIPAL IMPROVEMENTS—*Condemnation of land—Assessments for benefits—Case at bar.*—C owned a vacant corner lot, fronting 23 feet on Granby street and 39 feet on Plume street. City of Norfolk proposed to widen Plume street ten feet. Abutting land-owners refused to sell. Condemnation proceedings were resorted to under the charter, corresponding to Code 1873, chapter 56, §§ 6–10. Commissioners reported that of C's lot 10 feet fronting on Granby street, running back on Plume street 39 feet, must be taken, and that he was entitled to $1,200 for the land taken and for the damages to the residue above the peculiar benefits. City accepted and paid the estimate. About five months later the city assessed a tax of $1,500 against the residue for the peculiar benefits or betterments.

HELD:

   Under its charter the city had no authority to impose any such burden.

2. CONSTITUTIONAL LAW—*Quære.*—Whether or not the Constitution of Virginia, Art. X., § 1, which declares that "taxation, whether imposed by the state, county, or corporate bodies, shall be equal and uniform," and that "no one species of property shall be taxed higher than any other species of equal value," allows any legislation authorizing local assessments on the part of a city for public improvements ?

Argued at Richmond. Decided at Wytheville. Appeal from decree of circuit court of city of Norfolk, rendered May 25th, 1889, in the chancery suit therein then pending, wherein William W. Chamberlain was complainant and the city of Norfolk and L. H. Shields, the collector of said city, were defendants.

In the latter part of the year 1884 the common and select

councils of the city of Norfolk decided, without petition from the majority of land-owners along the line, to open and extend Plume street .from Granby to Bank street, sixty feet wide, which involved the widening of said street ten feet from Granby to Concord street, and caused notice of such decision to be published in two or more newspapers in said city for twenty days. Failing to purchase or obtain by agreement from the owners along the line of said street the land necessary for widening and extending the same, the city of Norfolk, on the 12th day of January, 1885, filed a petition in the corporation court of said city setting forth the proceedings of her said councils touching the proposed improvements, the object of which was the acquisition of the necessary land along the line of said street, and commissioners were appointed by said court for the condemnation of such land, according to the provisions of chapter 56 of the Code of 1873, and section 22 of chapter 3 of the charter of said city. Of the land-owners along the line of the proposed improvement W. W. Chamberlain was one, and he was the owner of a vacant lot on the corner of Granby and Plume streets, fronting 23 feet on Granby and running back 39 feet to Concord street. In other words, Plume street, 50 feet wide, west of Granby street, and extending easterly across Granby street to Concord street, has been an open street since about the year 1803. Concord is a narrow street, 20 feet wide, extending east of Granby street and about 39 feet therefrom. Thus the vacant lot owned by W. W. Chamberlain was situated on the corner of Granby and Plume streets, as the latter then existed and had existed for a great number of years, and had a frontage of 23 feet on Granby street and extending back 39 feet to Concord street.

On the 3d day of March, 1885, the commissioners appointed as aforesaid for the condemnation of the land requisite for said improvement made their report to said corporation court,

wherein, among other things, they say that of the said lot of W. W. Chamberlain, about ten feet front thereof on Granby street, running back 39 feet to Concord street, would be taken, and that, upon a view thereof and upon such evidence as was before them, they were of opinion and ascertained that for such portion of said lot, and for the damage to the residue thereof *beyond the peculiar benefits to be derived in respect to such residue from the work to be constructed, the said Chamberlain was entitled to $1,200 as a just compensation therefor.*

This report was, on the 18th day of March, 1885, confirmed by said corporation court, the money awarded Chamberlain was paid into court, and by an order of said court was paid to Chamberlain; and thus the city of Norfolk acquired title to that portion of Chamberlain's lot so taken.

Afterwards, in August, 1885, the committee on opening Plume street having reported that the finance committee had paid into court the amount of the damages assessed in the condemnation proceedings, with a recommendation that the councils instruct the board of street, sewer, and drain commissioners to open Plume street as proposed, and also that said councils appoint a committee to assess the betterments to the property along the line of said street, and to return a report thereof, with the names of the owners and the amounts of said betterments, and that the amounts so assessed "be collected in the usual way and at as early a day as possible, so as to offset the damages assessed, as interest is being paid on the money borrowed for the payment of damages"; and the committee was accordingly appointed. And on the 29th of June, 1886, this committee made its report to the common council, and on the next day, June 30th, 1886, it reported to the select council their assessments for betterments, and on those days, respectively, the report was adopted by said councils. By the report of said committee, W. W. Chamberlain was assessed with $1,500 for betterments, or $300 more than he had re-

ceived for that portion of his lot taken under the condemnation proceedings.

In their order assessing the betterments, the councils for the first time declared that the whole expense of widening and extending said street should be assessed against the landowners along its line; but in no previous proceeding, nor in the newspaper publication required by law, was such purpose declared or published.

In the statement of facts agreed it appears that the assessment was made according to no rule of uniformity—as, for example, by the front foot, superficial area, assessed value of the property, or otherwise—but, after visiting the premises and considering the frontage, depth, and location, the committee assessed what, in their opinion, were the benefits which would accrue to the several pieces of property against which the several assessments were made for the purpose of reimbursing the city for the amount paid to the land-owners in the proceedings for the condemnation of the land, aggregating $33,500, which had been paid by said city, as shown by said proceedings.

When the city attempted to collect the amount assessed against Chamberlain, he obtained an injunction, which, upon the hearing of the cause, was, by a decree rendered therein, made perpetual, and the city of Norfolk was also ordered to refund $600 and interest, which had been paid by Chamberlain under protest. From this decree the city of Norfolk obtained an appeal and *supersedeas.*

*J. F. Duncan, Borland & Willcox,* and *J. R. Mallett,* for appellant.

*Walke & Old,* for appellee.

RICHARDSON, J., (after stating the case,) delivered the opinion of the court.

1. The first and main question presented for decision is, What was the effect of the condemnation proceedings had in this case in pursuance of the provisions of chapter 56 of the Code of 1873 ?  In other words, the city of Norfolk having failed to acquire, by agreement with or by purchase from the owners thereof, the land along the line of Plume street necessary for widening and extending the same, and having been compelled, in order to acquire title to such lands, to resort to condemnation proceedings, as prescribed by chapter 56 of the Code of 1873, and having, under such proceedings, ascertained and paid to the owners, respectively, the amounts so ascertained to be just compensation for the lands taken, and for the damage to the residue thereof *beyond the peculiar benefits to be derived in respect to such residue from the work to be constructed*, and having thus acquired title to such lands, including that taken from the appellee, has the said city authority, under its charter and the Constitution of Virginia, to turn round and assess against the owners, for *betterments* to the residue of such property, an amount greatly in excess of the amounts assessed and paid to them under the condemnation proceedings as just compensation for the lands taken, and for the avowed purpose of reimbursing the city treasury for the amount paid for the land taken ?

After a most careful consideration of the subject, we are clearly of opinion that the city has no authority to impose any such burden.   The question, as here presented, is one of first impression in this state, and is one of vast importance.

It has been repeatedly held by this court that municipal corporations have the power to make local assessments for improvements, subject, however, to the conditions precedent prescribed by their charters, and the city ordinances made in pursuance thereof.   See *Norfolk City* v. *Ellis*, 26 Gratt. 224; *Sands* v. *City of Richmond*, 31 Gratt. 571 ; *Davis* v. *City of Lynchburg*, 84 Va. 861.   These cases follow, though with

some noteworthy qualifications, the doctrine laid down in the leading New York case of *The People* v. *Mayor*, *&c.*, *of Brooklyn*, 4 Com. 419. The doctrine held in that case, if viewed in the light of the present Constitution of Virginia, cannot, it would seem, be considered otherwise than as unwarranted and dangerous in the extreme. Yet it was very generally adopted and followed in most of the states. It is therefore important to examine somewhat into that doctrine, with the view of determining whether, and, if so, to what extent, it may be applied under our own Constitution.

In that case it was held, reversing the supreme court of New York in the same case, that " a statute which authorizes a municipal corporation to grade and improve streets, *and to assess the expense among the owners and occupants of lands benefitted by the improvement, in proportion to the amount of such benefits*, is a constitutional and valid law." That such an assessment is an exercise of the power of taxation vested in the state government, and is not in conflict with that part of the Constitution which declares that " no person shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation "; and that the power to tax implies a power to *apportion* the tax as the legislature shall see fit, and that the power of apportionment has no limit where there is no constitutional restraint.

Later on, when we come to examine the reasoning on which these conclusions were reached, it will be seen that the whole thing is based upon the idea that the legislature is possessed of inherent and absolute power over the subject of taxation, and may, under the implied power of apportionment, arbitrarily distribute the burden, regardless of the fundamental principle of equality and uniformity. Can this be true under the Virginia Constitution ? We think not.

The Virginia Constitution of 1851 declared that " taxation

shall be equal and uniform throughout the commonwealth; and all property, other than slaves, shall be taxed in proportion to its value"; and in *Gilkeson* v. *The Frederick Justices*, 13 Gratt. 577, it was held that this provision related to taxation by the general assembly for purposes of state revenue; and did not apply to taxes and levies by the counties and corporations for local purposes. And in *Norfolk City* v. *Ellis, supra*, Judge Staples, after referring to *Gilkeson* v. *The Frederick Justices*, says: "The present Constitution, however, includes counties and corporate bodies also; so that the prohibition, which was formerly confined to the state government, must now equally apply to corporate bodies; but in either case the prohibition relates to taxation for purposes of revenue, and not to those assessments made by municipal authorities, upon the owners of real estate within the corporate limits, for local improvements. These assessments are not founded upon any idea of revenue, but upon the-theory of benefits conferred by such improvements upon the adjacent lots. It is regarded as a system of equivalents. It imposes the tax according to the maxim, that he who receives the benefit ought to bear the burthen ; and it aims to exact from the party assessed no more than his just share of the burthen, according to an equitable rule of apportionment."

This, at first blush, would seem to be an unqualified endorsation of the New York doctrine, yet it is not, for the doctrine held in the leading New York case is, that, in the absence of some express constitutional restriction, the legislative will, under the power of apportionment, is absolutely without limit ; while Judge Staples holds the doctrine that the system of local assessments seeks to impose the tax according to the maxim, that he who receives the benefit ought to bear the burthen, and that it aims to exact from the party no more than his just share of that burthen, according to an *equitable rule of apportionment*. And, further on in his opinion,.

Judge Staples says: " I do not mean to say that cases may not occur of such gross oppression and injustice as to require judicial interference ; but they are exceptional, and must be decided as they arise, upon the particular circumstances attending them, rather than upon any general rule or principle." The New York doctrine recognizes no such exceptions, but invests the legislature with plenary powers that enables it to apportion the tax without regard to any equitable rule.

Now, it cannot be denied that in general the maxim, that he who receives the benefit ought to bear the burthen, is a just one ; and if it can be shown that the system of local assessments, which imposes the whole expense of a local improvement upon the abutting property, is founded on any principle of substantial justice, and that an equitable apportionment is attainable under that system, then the maxim invoked is clearly applicable. But if, as may readily be shown, the system itself rests upon no just principle, is opposed to the fundamental principles of free government, and, instead of being a legitimate mode of taxation, is simply arbitrary exaction, then it should be either repudiated or so limited and restricted as to give reasonable protection to the citizen.

By section 1, Art. X., of the Constitution of Virginia, it is declared that: " Taxation, except as hereinafter provided, whether imposed by the state, county, or corporate bodies, shall be equal and uniform, and all property, both real and personal, shall be taxed in proportion to its value, to be ascertained as prescribed by law. No one species of property, from which a tax may be collected, shall be taxed higher than any other species of property of equal value." Then follow certain provisions indicated by the words, " except as hereinafter provided," contained in said first section. These refer in the main to cases which cannot be reached by the *ad valorem* system ; but running through them we find the idea enforced of taxation upon the basis of value, wherever that

principle can be applied.   And then, by section 20 of the same
article of the Virginia Constitution, it is declared : " No other
or greater amount of tax or revenue shall at any time be
levied than may be required for the necessary expenses of the
government, or to pay the existing indebtedness of the state."

These provisions of the Constitution are mandatory.   They
impose specific limitations and restrictions upon the taxing
power, both as to the mode and the extent of taxation, and
they must be observed and obeyed by the legislative depart-
ment of the government, unless that department, the mere
creature of the Constitution, has, by some occult process of
development, ceased to be subordinate, and has been invested
with authority paramount to that of the Constitution itself ;
unless, indeed, the representatives and mere servants of the
people have become their masters.

Laws made in violation of the Constitution are null and
void, and it is now well established that it is the function of
the courts so to declare them in any case coming before the
court which involves the question of their constitutionality.
This power of the courts to declare a law unconstitutional
can only exist where there is a written Constitution.   No
such power is possessed by the English courts, and an act of
parliament is absolutely conclusive and binds everybody when
once its meaning is ascertained.   But, where a written Con-
stitution exists, it is the expression of the sovereign will of
the people, and no arm of the government which owes its
existence to that Constitution, as does the legislature, can
violate this fundamental expression of the sovereign will.

As a matter of practice, courts will not ordinarily draw
into consideration constitutional questions collaterally, or
unless the consideration is necessary to the determination of
the very point in controversy.

In discussing the power of taxation, Judge Cooley says :
" When, therefore, the legislature assumes to impose a pecu-

niary burden upon the citizen, in the form of a tax, two ques-
tions may always be raised : First, whether the purpose of
such burden may properly be considered public on any of the
grounds above indicated ; and, second, if public, then whether
the burden is one which should properly be borne by the
district upon which it is imposed.   If either of these ques-
tions is answered in the negative, the legislature must be
held to have assumed an authority not conferred in the gen-
eral grant of legislative power, and which is therefore uncon-
stitutional and void.   ' Her power of taxation,' says an emi-
nent writer, ' is a great governmental attribute, with which
the courts have very wisely shown extreme unwillingness to
interfere ; but, if abused, the abuse should share the fate of
all other usurpations.'   In the case of burdens thus assumed
by the legislature on behalf of the state, it is not always that
a speedy and safe remedy can properly be afforded in the
courts.   It would certainly be a very dangerous exercise of
power for a court to attempt to stay the collection of state
taxes because an illegal demand was included in the levy ;
and, indeed, as state taxes are not usually levied for the pur-
pose of satisfying specific demands, but a gross sum is raised,
which, it is calculated, will be sufficient for the wants of the
year, the question is not usually one of the unconstitution-
ality of taxation, but of the misappropriation of moneys which
have been raised by taxation.   But if the state should order a
city, township, or village to raise money by taxation to estab-
lish one of its citizens in business, or for any other object equally
removed from the proper sphere of government, or should
undertake to impose the whole burden of the government
upon a fraction of the state, the usurpation of authority would
not only be plain and palpable, but the proper remedy would
also be plain, and no court of competent jurisdiction could
feel at liberty to decline to enforce the paramount law."
And the author adds : " In the second place, it is of the very

essence of taxation that it be levied with equality and uniformity; and to this end, that there should be some system of apportionment. When the burden is common, there should be common contribution to discharge it. Taxation is the equivalent for the protection which the government affords to the persons and property of its citizens; and, as all are alike protected, so all should bear the burden, in proportion to the interests secured."

In the present case it is not denied, nor can it be, that the imposition is a tax. Indeed, it is claimed that the assessment for betterments, the validity of which is here involved, is a legitimate exercise of the taxing power conferred by the legislature upon the municipal authorities of the city of Norfolk. Being a tax, and imposed for a public use, the widening and extending of a public street, and the whole burden imposed upon the few whose lots abut thereon, upon what conceivable principle can it be said not to be repugnant to our Constitution, which declares that "*taxation*,   *   *   * *whether imposed by the state, county, or corporate bodies*, shall be equal and uniform, and all property, both real and personal, shall be taxed in proportion to its value, to be ascertained as prescribed by law"; and that "no one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value"? This language is absolutely plain and unambiguous. It is a direct command issuing from the people, in whom all sovereignty resides. It leaves not a crack or crevice into which the wizard of construction can enter. How, then, can it be said, in the present case, that the essential principle of equality and uniformity, the very essence of taxation, has been observed? How can it be said that it is a burden that should be borne exclusively by the few whose property abuts on the proposed improvement? They are not relieved from their annual contribution to the city revenue, and with the addi-

tional ruinous burden of the assessment in question they become the victims of arbitrary exaction, amounting practically to confiscation. It was never the purpose of the framers of our Constitution to permit any such outrage and oppression. On the contrary, they were especially careful to guard against the very abuse of power here relied upon by the city of Norfolk as a legitimate exercise of the power of taxation. And, so far as human language could guard against such abuses, it was accomplished by the simple constitutional mandate that taxation shall be equal and uniform, upon the basis of value, and this whether imposed by the state, by the counties, or by the municipal corporations. Upon what principle of right, reason, and common justice can it be said that taxes may be apportioned without regard to equality and uniformity in a city, but that the principle of equality and uniformity must be observed in the state at large with respect to taxes for revenue? The proposition is nothing less than a palpable solecism in language. Municipal corporations exercise, by virtue of their charters, important legislative powers. They levy and collect taxes for revenue for municipal purposes, just as the state levies and collects taxes for state revenue. There is no just ground for the distinction; and our Constitution forbids any such unjust discrimination. The doctrine of local assessments proceeds upon the false assumption that the abutting property is exclusively benefitted by the improvement for the erection of which the whole expense is assessed against such property. The reasoning by which this conclusion is arrived at is unsound, and wholly fails to justify the conclusion itself.

In *Weeks* v. *Milwaukee*, 10 Wis. 258, the theory of local assessments is ably discussed by Judge Paine, and in an able opinion he demonstrates that the grounds upon which the system rests are wholly untenable. After stating the rule that uniformity in taxation implies equality in the burden, he says:

" The principle upon which these assessments rest is clearly destructive of this equality. It requires every lot-owner to build whatever improvements the public may require on the street in front of his lot, without reference to inequalities in the value of the lots, in the expense of constructing the improvements, or to the question whether the lot is injured or benefitted by their construction. Corner lots are required to construct and keep in repair three times as much as other lots; and yet it is well known that the difference in value bears no proportion to this difference in burden. In front of one lot the expense of building the street may exceed the value; and its construction may impose on the owner additional expense, to render his lot accessible. In front of another lot, of even much greater value, the expense is comparatively slight. These inequalities are obvious; and I have always thought that the principle of such assessments was radically wrong. They have been very extensively discussed, and sustained upon the ground that the lot should pay because it receives the benefit. But if this be true, that the improvements in front of a lot are made for the benefit of the lot only, then the right of the public to tax the owner at all for that purpose fails, because the public has no right to tax the citizen to make him build improvements for his own benefit merely. It must be for a public purpose; and, it being once established that the construction of streets is a public purpose that will justify taxation, I think it follows, if the matter is to be settled on principle, that the taxation should be equal and uniform, and that to make it so the whole of the taxable property of the political division in which the improvement is made should be taxed by a uniform rule for the purpose of its construction. But, in sustaining these assessments when private property was wanted for a street, it has been said the state could take it, because the use of a street was a public use. In order to justify a resort to the power of taxa-

tion, it is said the building of a street is a public purpose. But then, having got the land to build it on, and the power to tax by holding it a public purpose, they immediately abandon that idea, and say that it is a private benefit, and make the owner of the lot build the whole of it. I think this is the same in principle as it would be to say that the town in which the county-seat is located should build the county buildings, or that the county where the capital is should construct the public edifices of the state, upon the ground that, by being located nearer, they derived a greater benefit than others. If the question, therefore, was whether the system of assessment could be sustained upon principle, I should have no hesitation in deciding it in the negative. I fully agree with the reasoning of the supreme court of Louisiana in the case of *Municipality No.* 2 v. *White,* 9 La. Ann. 447, upon this point."

Judge Dillon, after a very full and learned discussion of the subject of local assessments, in the light of numerous authorities sustaining the theory upon which such assessments rests, observes : " But, on the other hand, it should be stated that, in *Illinois,* it was held, under the special provisions of the late Constitution, that special assessments made upon the sole basis of frontage were unconstitutional, as containing neither the element of ' uniformity ' nor ' equality,' which were regarded as essential to all taxation in that state, whether general or local " ; citing *Chicago* v. *Larned,* 34 Ill. 203 (decided in 1864). 2 Dil. Mun. Corp., § 759. The Constitution of Illinois (Art. IX., section 2) declared that the general assembly shall provide for levying a tax by valuation, so that all persons shall pay a tax in proportion to the value of their property. It also contained the following provision (Art. IX., section 5) : " That the *corporate authorities* of counties, townships, school districts, *cities, towns, and villages,* may be vested with *power to assess and collect taxes for corporate purposes ;* such taxes to be *uniform in respect to persons and*

*property within the jurisdiction of the body imposing the same.*" Also, the usual provision for compensation for private property taken for public use. By the revised charter of the city of Chicago it was empowered to grade, pave, and improve its streets, and to *assess the cost* upon the *real estate* fronting on the contemplated improvement. In a note to that case (*Chicago* v. *Larned*) Judge Dillon says : " The question of the constitutionality of this part of the charter arose, and was discussed by counsel with great analytic power and research. The opinion of the supreme court was, that the provisions of the Constitution were peculiar and more stringent than those in any other state (but in this respect the court was probably mistaken) ; that the principles of ' uniformity ' and ' equality ' of taxation applied to local as well as to general taxes ; and that a special assessment for a ' Nicholson pavement,' made on the basis of the *frontage* of lots on the street, was invalid, as being neither equal nor uniform. The court was of opinion that such assessments could only be made by assessing to each lot the special benefits it will derive from the improvement, charging such benefit on the lots, the residue of the cost to be paid by equal and uniform taxation." And Judge Dillon adds : " The prior decisions in that state upon the subject are reviewed, and, in effect, as it would seem to the author, over-ruled." And the author further says : " In *Ottawa* v. *Spencer*, 40 Ill. 211, (1866,) the same principle was adhered to and applied to a special assessment for building sidewalks."

In these cases ( *Weeks* v. *Milwaukee* and *Chicago* v. *Larned*) the assessments were made upon' the principle of requiring each owner to pay for the improvement in front of his lot ; but, upon principle, it would seem to make no material difference whether the abutters be required to pay the cost of the improvement in front of their respective lots, instead of having the whole expense of the improvement assessed or apportioned among all, on the basis of frontage, or of benefits,

although on this subject there has been much contrariety of opinion. On this subject Judge Dillon says: "It may be true that in some instances more hardship will be occasioned by requiring each owner to make or pay for the improvement in front of his own property than if the cost were assessed on the basis of frontage or of supposed benefits received ; still, it seems to the author difficult to find satisfactory and solid grounds on which to discriminate the cases, so as to hold that one is within the constitutional power of the legislature and the other is not." 2 Dil. Mun. Corp., § 753.

Whether the one mode or the other is preferable must depend upon the circumstances of each case as it arises. By either, in the nature of things, the result must be gross inequality and injustice. Public streets are for the use of the public ; and they are opened to the whole public—to every human being in the peace of the commonwealth—and they should be made and kept in repair by a general tax upon the persons and property within the municipality liable to taxation.

In *McBean* v. *Chandler*, 9 Heisk. (Tenn.) 349, decided in 1872, the supreme court of Tennessee expressed its approval of the Illinois decisions above referred to, and held that local assessments are included in the provision requiring all property to be taxed according to its value ; and that it is therefore beyond the power of the legislature to authorize a municipality to pave its streets and charge the cost thereof on the adjoining lots in proportion to their respective fronts. Under that decision the abutting property escaped a specific charge, estimated to amount to $1,500,000. In that case the two previous cases in that state (*Mayor* v. *Mabury*, 6 Humph. 371, and *Washington* v. *Nashville*, 1 Swan. 177), in which sidewalk assessments were sustained, were distinguished and limited. Judge Dillon, after referring to this case, in a note asks this pertinent question: "Must all local improve-

ments, such as sewers, sidewalks, paving streets, be now made at the expense of all the tax-payers of the city, or may they be made on the principle adopted in Illinois ?" 2 Dil. Mun. Corp., § 760.

Again, in summing up the general results of the decisions of the courts of the several states concerning special assessments for local improvements, the same author says, *inter alia*, that, "when not restrained by the Constitution of the particular state, the legislature has a discretion, co-extensive with the broad domain of legislative power, in making provisions for ascertaining what property is specially benefitted, and how the benefits shall be apportioned." And he adds : "This proposition, as stated, is nowhere denied, but the adjudged cases do not agree upon the extent of legislative power. The courts which have followed the doctrine of the leading case in New York " (*People* v. *Mayor, &c., of Brooklyn, supra,*) "have asserted that the authority of the legislature in this regard is quite without limits ; but the decided tendency of the later decisions, including the courts of *New Jersey, Michigan,* and *Pennsylvania,* is to hold that the legislative power is not unlimited, and that those assessments must be apportioned by some rule capable of producing reasonable equality, and that provisions of such a nature as to make it *legally impossible* that the burden can be apportioned with proximate equality are arbitrary exactions, and not an exercise of legislative authority." It thus clearly appears that this learned and able author recognizes the fact that there is a tide of judicial decisions strongly opposed to the New York doctrine with respect to legislative authority regarding local assessments. And, in closing his summary, the same author says : "But, since the period when express provisions have been made in many of the state Constitutions, requiring *uniformity and equality of taxation,* several courts of great respectability, either by force of this requirement or

in the spirit of it, and perceiving that *special benefits actually received* by each parcel of contributing property was the only principle upon which such assessments can justly rest, and that any other rule is unequal, oppressive, and arbitrary, have denied the unlimited scope of legislative discretion and power, and asserted, what must be regarded upon principle as the just and reasonable doctrine, that the cost of a local improvement can be assessed upon particular property only to the extent that it is specially and peculiarly benefitted; and, since the excess beyond that is a benefit to the municipality at large, it *must* be borne by the general treasury."

The Pennsylvania and other cases referred to are especially instructive, and some of them may be here again referred to with profit. In *Hammett* v. *Philadelphia*, 65 Pa. St. 146, the question was as to the validity of an act of assembly authorizing the city of Philadelphia to take a street already laid out, and in good condition, and improve it for a public drive or carriage-way, and to assess the expense thereof upon the property abutting upon said street. The court held this to be unconstitutional, upon the ground that it imposed a local assessment for an improvement which was for the public benefit. The Constitution of that state contained no clause restraining the legislative discretion; but it was said the limitation grew out of the very nature of the subject. In delivering the opinion in that case, Mr. Justice Sharswood said: " The original paving of the street brings the property bounding upon it into the market as building lots. Before that it is a road, not a street. It is therefore a local improvement, with benefits almost exclusively peculiar to the adjoining properties. Such a case is clearly within the principle of assessing the cost on the lots lying upon it.. * * * But, when a street is once opened and paved, thus assimilated with the rest of the city and made a part of it, all the particular benefits to the locality derived from the improvements have been

received and enjoyed. Repairing streets is as much a part of the ordinary duties of the municipality—for the general good—as cleaning, watching, and lighting. It would lead to monstrous injustice and inequality should such general expenses be provided for by local assessments." And the court laid down the following general rule : " Local assessments can only be constitutional when imposed to pay for local improvements, clearly conferring special benefits on the properties assessed, and to the extent of those benefits. They cannot be so imposed where the improvement is either expressed or appears to be for general public benefit."

In the case of *Washington Avenue*, 69 Pa. St. 352, Judge Agnew, delivering the opinion, and referring with approval to *Hammett* v. *Philadelphia, supra*, says : " Indeed, I consider it a fortunate circumstance that that case came up ; for it led to an inquiry into the power of special taxation, which was in danger of running wild by insensible degrees, and leading, before we had become aware of it, into the exercise of a bastard power, dangerous to the right of private property, and violative of the provisions in the Bill of Rights placed there for its protection. In questions of power exercised by agents, it is sometimes the misfortune of communities to be carried, step by step, into the exercise of illegitimate powers, without perceiving the progression, until the usurpation becomes so firmly fixed by precedents it seems to be impossible to recede or to break through them. The majority opinion in that case did not then, and this opinion does not now, dispute the long-recognized power of local taxation for local improvements, according to the benefits conferred ; but they meet and dispute departures from that power, which, if recognized, will end in the overthrow of the right of private property. Laws which cast the burdens of the public on a few individuals, no matter what the pretense or how seeming their analogy to constitutional enactments, are, in their essence, despotic and tyrannical ;

and it becomes the judiciary to stand firmly by the fundamental law, in defense of their general, great, and essential principles of liberty and free government, for the establishment of which the Constitution itself was ordained."

*Seely* v. *Pittsburg*, 82 Pa. St. 360, decided in 1887, was similar to the *Washington Avenue Case, supra;* and it was held that the cost of paving Pennsylvania avenue in Pittsburg, which extended along platted lots and also beyond and along suburban and unplatted property, could not be authorized by the legislature to be assessed by the *frontage* rule. Ch. J. Agnew, after stating the cost of the improvement to have been $350,000, and the character of the avenue, says: "This blending of city and country, of city lots and farm lands, of residences of the living and the graves of the dead (St. Mary's cemetery), constitute a group so motley and discordant, a series so wanting in similitude and uniformity, that the frontage, or per foot rule cannot be applied to it. It is so plainly, palpably, rankly, and ruinously unjust, it must be pronounced no proper or lawful mode of special taxation, but an injustice so gross as to be void against the rights of property as protected by the Bill of Rights."

This case well illustrates the alarming extent to which the idea of legislative supremacy, with respect to the power of apportioning taxation, has been pushed; and it was doubtless this that called forth the emphatic language of disapproval by Chief Justice Agnew, above quoted. See also *Winston* v. *Philadelphia*, 80 Pa. St. 505; *Saw-Mill Run Bridge*, 85 Pa. St. 163, holding "that a bridge, which is a part of a public highway, is a public and not a local improvement, and legislation authorizing the assessment of its cost upon the properties benefitted will not be sustained, as all citizens have an interest in such an improvement, and the assessment of its cost upon individuals would be taking private property for public use without just compensation."

But, we ask, is not the same essentially true as respects the building or repairing a street? All streets which are opened for public use are public benefits, and it is upon that ground only that private property can be taken for their construction. If, therefore, as is necessarily true, a bridge, which is part of a public highway or street, is a public and not a local improvement, and the cost thereof cannot be assessed upon the properties benefitted, it follows, as the shadow the substance, that the same principle must be applied to the street at large, or to so much of it as may be included in the proposed improvement.

The cases referred to above stand honestly and fearlessly by the fundamental principles which underlie free government, and they resolutely oppose the arbitrary system of local assessments, which, in this country, originated in the case of *The People* v. *Mayor, &c., of Brooklyn, supra*—the case uniformly referred to as the leading case on the subject. It is important to examine somewhat into the reasoning upon which the conclusion arrived at in that case was based. The question was as to the validity of a provision in the charter of Brooklyn *requiring* the expense of local improvements to be assessed upon the owners and occupants of all the lands and premises benefitted thereby, in proportion to the amount of such benefit. Under this provision the municipal authorities of the city caused Flushing avenue, one of the streets of that city, to be graded and paved, at an expense of $20,390.25, which was assessed according to the said provision of the charter. The assessment having been confirmed by the common council, the cause was removed by *certiorari* into the supreme court of that state, where the proceedings were reversed and the assessment annulled, on the ground that the said provision of the charter was unconstitutional and void. Thereupon the mayor and common council took the case to the court of appeals of New York,

where the supreme court was reversed, Judge Ruggles delivering the opinion. In the course of the opinion there occurs this striking reference to the opinion delivered in the supreme court: " In the case of *The People* v. *Brooklyn*, before referred to, it was said that a tax, to be valid, must be apportioned ' upon principles of just equality,' and upon all the property in the same political district; and that this is a fundamental principle of free government, which, although not contained in the Constitution, limits and controls the power of the legislature. This," says Judge Ruggles, " is new, and it seems to me to be dangerous doctrine. It clothes the judicial tribunals with the power of trying the validity of a tax by a test neither prescribed nor defined by the Constitution. If, by this test, we may condemn an assessment apportioned according to the relation between burthen and benefit, we may with far better reason condemn a capitation tax on the ground that numerical equality is not just equality ; or a general property tax, for a local object, because it compels one portion of the community to pay more than their just share for the benefit of another portion. All discriminations in the taxation of property, and all exemptions from taxation on grounds of public policy, would fall by the application of this test. If this doctrine prevails, it places the power of the courts above that of the legislature in a matter affecting not only the vital interests, but the very existence of the government. It assumes that the apportionment of taxation is to be regulated by judicial, and not by legislative, discretion. It obstructs the exercise of powers which belong to, and are inherent in, the legislative department, and restrains the action of that branch of the government in cases in which the Constitution has left it free to act."

Such is the palpably specious and unsound reasoning of Judge Ruggles in support of his theory of local assessments. And yet, in a previous paragraph of the same opinion, when

speaking of the change of policy affected by the provision of the charter he was considering, he said : " It is conceded that the grading and paving of Flushing avenue was a public work, the expense of which might rightfully have been raised by general taxation upon all the taxable inhabitants of Brooklyn. The legislature thought proper to shift the burthen of this taxation upon that part or class of inhabitants exclusively whose lands were benefitted by the work, and to impose it on them in proportion to the benefit they respectively received therefrom. This change in the apportionment of the burthen was obviously made for the purpose of avoiding the injustice of general taxation for a special local object, the benefit of which extended only to a portion of the inhabitants of the city. It professed to apportion the tax according to the maxim, that ' he who receives the advantage ought to sustain the burthen,' and to exact from each of the parties assessed no more than his just share of the burthen, according to this equitable rule of apportionment."

The whole argument is illogical, unsound, and opposed to all the teachings of experience. Who, then, introduced " a new and dangerous doctrine" ? Was it the judge who delivered the opinion of the supreme court, holding that " a tax to be valid must be apportioned upon principles of just equality," and upon all the property in the same political district, or was it the judge who delivered the opinion in the court of appeals, repudiating that doctrine, and yet admiting that the tax in that case might rightfully have been raised by general taxation upon all the taxable inhabitants of Brooklyn ? Surely it was the latter.

It cannot be true, as assumed by Judge Ruggles, that the legislature of New York thought proper to change the state policy in regard to taxation by municipalities, and to shift the burthen of grading and paving streets, &c., from the inhabitants at large, and to place it upon that part or class of per-

sons whose lands are supposed to be benefitted, and in proportion to the benefits respectively received by them; because, first, all class legislation is repugnant to free government; and, second, because the legislature must have known that the improvement of a street was not a special local improvement, for the exclusive benefit of any class, but was a public improvement, for the use of the general public; that experience teaches that local assessments for public purposes are unjust and oppressive; and that equality and uniformity can be more nearly approximated by general taxation, upon the the basis of value, than by any other mode ever devised by man. Indeed, this is admitted, in effect, by Judge Ruggles himself; for, in another part of his opinion, he says: " A property tax for the general purposes of the government, either of the state at large or of a county, city, or other district, is regarded as a just and equitable tax. The reason is obvious. It apportions the burthen according to the benefit more nearly than any other inflexible rule of general taxation."

If this be so, why depart from the rule and adopt another, by which it is *legally impossible* that the burden can be apportioned with proximate equality, and which amounts to arbitrary exaction, and is not, therefore, a legitimate exercise of the taxing power ? If the cost of grading, paving, or curbing a public street, or of constructing sewers and the like, is to be apportioned among the owners and occupants of lands benefitted by the improvement, in proportion to the amount of such benefit, then, by the very terms of the requirement, the all-important question presents itself, Who are the persons benefitted, and where shall the line be drawn ? Admit, for the sake of argument, that the abutting owners are more immediately benefitted than others whose properties are not on, but near by, on some other street: does not common justice require that the latter should and must, by the very terms of the rule itself, contribute in proportion to the benefits

received by them? And so, extending the ratio of benefits to the utmost limits of the municipality, does not the rule itself require that each inhabitant shall contribute according to his nearness to, or remoteness from, the improvement; or, in other words, according to the location of his property with respect to the improvement? This question can receive no other than an affirmative answer, and yet the result of the rule in practice is to dump the whole cost upon the abutting owners. Why? Simply because a literal compliance with the rule, requiring the cost of the improvement to be assessed among the owners and occupants of lands benefitted by the improvement, in proportion to the amount of such benefit, would involve the solution of a problem far beyond the reach of mathematics. Why, then, struggle with any such a labyrinth of absurd inconsistencies and contradictions, when all the difficulty and trouble is obviated, and the way made plain, by resorting to the obviously just principle of general taxation of all taxable property according to its value—the mode prescribed by our Constitution as to the state, the counties, and the corporations, and the only mode by which proximate equality is attainable? It is true that exact equality and uniformity is not attainable under any system, because of the infirmities of man's nature, and the consequent imperfections of all human institutions; but it is undeniably true that the mode prescribed by the Constitution comes nearer attaining the desired end than any other known mode. There is absolutely no good reason why general taxation should not be resorted to in an incorporated city or town as well as in the state at large. The state makes no such discrimination in assessing taxes for revenue with which to defray the expenses of the state government. Upon what conceivable principle, then, can it be said that a municipal corporation, authorized by law to levy taxes for municipal revenue with which to defray the expenses of the municipality, may

be authorized by the legislature to adopt a different mode, and one not only unjust and oppressive, but plainly forbidden by the Constitution? We know of none.

The opinion of Judge Ruggles, in the New York case, is based mainly upon the observations of Chief Justice Marshall in the case of the *Providence Bank* v. *Billings*, 4 Peters 514, from which he quotes, for the avowed purpose of showing the "nature and extent of the power of taxation vested in the legislatures of the state governments," as follows:

"The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle, which has its foundation in society itself. It is granted by all, for the benefit of all. It resides in the government as part of itself, and need not be reserved where property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burthens; *and that portion must be determined by the legislature.* This vital power may be abused; but the interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation."

This is a singularly inaccurate quotation to come from a high judicial source. It imputes to Chief Justice Marshall language never used by him, and radically changes the meaning of the language really used by that great judge; that is, if we are to be guided by the official report of the opinion. See 4 Peters, at p. 563. The misquotation is with respect to two sentences in the opinion—the one immediately following the other, and it consists in entirely omitting most important words in each, and in thus transforming the two

sentences into one.    We will here give the language of Chief Justice Marshall as it appears in his officially-reported opinion, italicising the language omitted by Judge Ruggles, and then follow it with the language imputed by the latter to the former, so as to present sharply to view the difference in sense and meaning wrought by the transformation.

Chief Justice Marshall said this :    " This vital power may be abused ; but *the Constitution of the United States was not intended to furnish the corrective for every abuse of power which may be committed by the state governments.*  The interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security, *where there is no express contract,* against unjust and excessive taxation, as well as against unwise legislation *generally.*"

Judge Ruggles omits all the italicised words in the first of these two sentences, and then, after omitting the very important italicised words from the second of them, he substitutes the entire remainder of the sentence for the words stricken out of the first sentence ; and in so doing transforms the two sentences into one—makes Chief Justice Marshall say :    " This vital power may be abused ; but the interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation."

The damaging effect of the misquotation is too apparent to need comment.    It may be remarked, however, that in that case the question was whether a bank, chartered by the state, was subject to taxation by that state.    It was contended by the bank that the power of taxation was inconsistent with the charter, because it might be so exercised as to destroy the object for which the charter was given.    There was nothing in the charter which, either expressly or by necessary implication, tended to show that it was the intention to exempt the bank from taxation ; and, in treating the matter in the light of

a *contract* between the state and the bank, Chief Justice Marshall, by way of illustrating the right of the state to impose the tax in that case, said : " However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burthens; and that portion must be determined by the legislature.    This vital power may be abused ; but the Constitution of the United States was not intended to furnish the corrective for every abuse of power which may be committed by the state governments.    The interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security, where there is no express contract, against unjust and excessive taxation, as well as against unwise legislation generally."

The question in that case was whether the charter imported *a contract* exempting the bank from taxation ; and, holding that there was no such contract, it became important to use the efficient qualifying words, " where there is no express contract."    If Chief Justice Marshall had been construing a Constitution which imposed no restrictions upon the legislative power of taxation, he would doubtless have framed a sentence similar in all respects to that used by him in that case, except that he would have used the words, " there being no express constitutional restriction," instead of the words " where there is no express contract."    But if Chief Justice Marshall had been construing an instrument like the present Constitution of Virginia, declaring in the most emphatic terms that " taxation, * * * whether imposed by the state, county, or corporate bodies, *shall* be equal and uniform, and all property, both real and personal, *shall* be taxed in proportion to its value," and that " no one species of property from which a tax may be collected *shall* be taxed higher than any other species of property of equal value," it is impossible to believe that he would not have held these specific declarations as paramount to any

mere legislative will, and as specific limitations upon the legislative power of taxation.

There is nothing in the language of Chief Justice Marshall, quoted above, which, when properly understood and applied, has the least tendency to attribute to the legislatures of the several states powers, either in respect to taxation or anything else, superior to the organic law. A little examination into the subject will show that generally the state Constitutions of that early day did not as carefully restrict legislative power as subsequent experience has shown to be necessary. This is especially true with Virginia, and may be illustrated by some of the earlier decisions of this court; as, for example, in the cases of *Gilkeson* v. *The Frederick Justices,* 13 Gratt. 577, and *Langhorn & Scott* v. *Robinson,* 20 Gratt. 661. In the last-named case, in delivering the opinion of the court, Joynes, J., says : " This question arises under the Constitution of 1830, which was in force on the 24th day of March, 1848. There is no provision in the body of that Constitution imposing any restriction upon the legislature in reference to the power of taxation. The only provision on that subject, in the entire instrument, is contained in Article VI. of the Bill of Rights, in these words : ' That elections of members to serve as representatives of the people in assembly ought to be free ; and that all men having sufficient evidence of permanent common interest with, and attachment to, the community, have the right of suffrage, and cannot be taxed or deprived of their property, for public uses, without their own consent or that of their representatives so elected, nor bound by any law to which they have not in like manner assented, for the public good."

Now, when we compare that provision, in the Constitution of 1830, with the provision in the present Constitution of Virginia, it is at once obvious that decisions of this court made under the former can have no just influence upon the decision of questions arising under the latter with respect to the legis-

lative power of taxation. It is true, as was said by Chief Justice Marshall, that the power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic; that this is an original principle, which has its foundation in society itself; that it is granted by all, for the benefit of all, and that it resides in government as part of itself, and need not be reserved when property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. But in all this it is nowhere said, nor can it be implied from what is said, that the legislature may with impunity disregard the mode of taxation prescribed by the Constitution, and prescribe a different mode, either for the state at large or any of its political sub-divisions. If it may be done with regard to incorporated cities and towns, it may with equal propriety be done with respect to the counties of the state; for they, too, are municipal corporations in a certain legal sense. The Constitution requires equality and uniformity of taxation upon the basis of the value of property. Any departure therefrom, whether with respect to taxes imposed by the state, by the counties, or by the incorporated cities and towns, is necessarily repugnant to the Constitution, and should be so held by the courts whenever a case is presented in which it is absolutely necessary to pass upon the question whether the legislature has power under the Constitution to confer upon municipal corporations authority to make local assessments for public streets and the like.

It is also true, as was said, in substance, by Chief Justice Marshall, that however absolute the right of an individual with respect to his property may be, it is still in the nature of that right that it must bear a portion of the public burthens; and that portion must be determined by the legislature. But this by no means signifies unequal, unjust, and oppressive apportionment of the burden of taxation, whereby a small

VOL. LXXXIX—29

class of the inhabitants may be ruinously taxed for the erection of an improvement for the benefit of the public at large.

And Mr. Justice Ruggles also quotes, in his opinion in the New York case, the remark of Chief Justice Marshall in *McCullock* v. *Maryland*, 4 Wheat. 428, where it is said : "It is admitted that the power of taxing the people and their property is essential to the very existence of the government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax the government acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a state, therefore, give to their government a right of taxing themselves and their property ; and, as the exigencies of the government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and the influence of the constituents over their representatives, to guard them against its abuse." And Judge Ruggles adds : " And again, at page 430, he speaks of it as ' unfit for the judicial department to enquire what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power.' "

The above quotation from the opinion of Chief Justice Marshall is also inaccurate in one particular of some importance. In one sentence he is quoted as saying : " In imposing a tax the *government* acts upon its constituents." Chief Justice Marshall said : " In imposing a tax the *legislature* acts upon its constituents " ; the inaccuracy being the substitution of the word " government " for the word " legislature " employed by Chief Justice Marshall. The distinction between the government and the legislative department of the government is palpable. The government proper consists of three co-ordinate

departments—the executive, legislative, and judicial—and these are the creatures of and derive their powers from the Constitution of the state, which is the chart of government—the solemn expression of the sovereign will of the people. The Constitution intrusts the exercise of the taxing power to the legislature, subject, however, to the limitations and restrictions contained in that instrument.

But while Judge Ruggles quotes the remark of Chief Justice Marshall in *Providence Bank* v. *Billings* and in *McCullock* v. *Maryland*, for the avowed purpose of showing the nature and extent of the power of taxation vested in the legislatures of the state governments, and for the obvious purpose of laying a broad foundation upon which to erect his peculiar theory in respect to local assessments, it will be seen that there is nothing in the language relied upon that can be fairly construed as favoring the conclusion arrived at in the New York case—certainly nothing when taken in connection with the present Constitution of Virginia; and, as we shall presently see, nothing from the standpoint of the New York Constitution itself, even according to Judge Ruggles' statement of the restrictions contained in that instrument, and of the history of the proceedings in convention, which led to their adoption. The language of Chief Justice Marshall in *McCullock* v. *Maryland*, above quoted, was employed by that great judge in combating the claim asserted by the state of Maryland of the right to impose a tax upon a branch of the Bank of the United States located in said state. In doing this he distinguishes between the nature of the power of taxation conferred by the people of a state upon their government and that exercised by the general government; and, by way of illustrating that all subjects over which the sovereign power of a state extends are objects of taxation, but that those over which it does not extend are, upon the soundest principles, exempt from state taxation, proceeds to say, in substance,

that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it; that the only security against the abuse of this power is found in the structure of the government itself; that in imposing a tax the legislature acts upon its constituents, which is in general a sufficient security against erroneous and oppressive taxation. And Chief Justice Marshall continues his illustration by adding: "The people of a state, therefore, give to their government a right of taxing themselves and their property; and, as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representatives, to guard them against its abuse. But the means employed by the government of the Union have no such security, nor is the right of a state to tax them sustained by the same theory. Those means are not given by the people of a particular state, not given by the constituents of the legislature which claims the right to tax them, but by the people of all the states. They are given by all, for the benefit of all—and, upon theory, should be subjected to that government only which belongs to all."

In all this there is nothing which, at the present day, can be construed as authority for the system of local assessments in question—a system by which improvements are constructed for the use and benefit of the public at large, and the whole expense thereof imposed upon the few whose property happens to abut on the proposed improvement, and upon no other ground than the vague supposition that the properties thus taxed will be benefitted to the extent of the burdens respectively imposed upon them. It is rank injustice, and but little short of down-right robbery, to impose a ruinously heavy tax

upon any such principle. It is grossly unjust, as well as dis-
tructive of the principles of free government, to hold that the
expense of opening, widening, extending, or otherwise im-
proving a public street in a city or incorporated town should
be borne by the few who live nearest to it, when such im-
provement, if made, is founded in public necessity, and is not
only open to the public at large, but is used by the public,
perhaps, hundreds of times to where it is used once by any
one of the abutting owners who are made to bear the burden
of its erection. Any such imposition is necessarily repulsive
to the sense of justice of every fair-minded man, and it would
seem impossible for any free government to long survive the
practice of such inequality, extortion, and oppression. There
is no just ground upon which to place any such arbitrary
system of taxation, and any such system is opposed to the
very letter and spirit of our Constitution.

It is undoubtedly true, as was said by Chief Justice Mar-
shall in *McCullock* v. *Maryland*, that the power of taxing
the people and their property is essential to the very exist-
ence of government, and may be legitimately exercised on the
objects to which it is applicable, to the utmost extent to
which the government may choose to carry it. But Chief
Justice Marshall did not say, and never intended to say, that
the legislature of a state constitutes the state government, or
that the *structure* of the government is to be determined by
legislative enactment. On the contrary, when it is necessary
to determine what is the structure of government, which,
Chief Justice Marshall says, is the only security against the
abuse of legislative power, we look not to legislative
enactments, but to the Constitution itself, which is the expres-
sion of the will of the people, in whom all sovereignty resides,
subject only to the paramount obligation of obedience to the
Federal Constitution. And so, when it becomes necessary to
determine to what extent, and subject to what limitations and

restrictions, the state government has intrusted to its legislature the power of regulating taxation, we must look to and be guided by the Constitution of the state, that being the chart of government—the paramount law to which each of the co-ordinate departments owes allegiance and obedience. And this is what Chief Justice Marshall meant, and all that he meant, when he said that the power of taxation may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it.

*McCullock* v. *Maryland* was decided in 1819, in the very infancy of the government, when the interest of the legislator, the relation of representative and constituent, and the responsibility of the former to the latter, were deemed sufficient guaranties against erroneous and oppressive taxation; and hence, in the early Constitutions of the several states, we find few, if any, material restrictions upon the legislative power of taxation. And at that time it was true, as said by Chief Justice Marshall, that " the people of a state, therefore, give to their government a right of taxing themselves and their property ; and, as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representatives, to guard them against its abuse."

But however true all this was at the time Chief Justice Marshall decided the case of *McCullock* v. *Maryland*, and with respect to the early Constitutions of the several states, the people have learned by sad experience that influences, other than those prompted by patriotism, have too often swayed legislation to the serious detriment of the state ; that fraud and peculation have far too often been clothed with legislative sanction ; and that fraudulently-procured legislation has become an evil so common as to seriously threaten the

integrity and safety of government in many of the states. Hence the framers of the more recent state Constitutions have been careful to incorporate into them most stringent provisions intended to protect the people against legislative abuse of the power of taxation. This is especially true with regard to Virginia, as will at once appear by comparing her present Constitution with that of 1830, before referred to.

It is, therefore, obvious that the remarks of Chief Justice Marshall, when properly understood and applied, did not, even at that early day, afford any just ground upon which to rest the principles laid down by Judge Ruggles in the leading New York case. The remarks of Chief Justice Marshall were made with reference to the extent to which the legislature, when no restrictions were imposed, might tax the people and their property, and not with respect to the mode of taxation; and nothing that he said in any way sanctions the unequal, unjust, and oppressive system of local assessments for the use and benefit of the public at large— a system not founded in any just principle of equality and uniformity, and by which the few are taxed for the benefit of the many. On the other hand, Judge Ruggles was discussing, not the *extent* to which a legislature, in the absence of constitutional restrictions, might tax the people and their property, but was discussing the *modes* of taxation to which, in virtue of its inherent power over the subject, the legislature of a state might resort; and he laid down the proposition that taxes cannot be laid without apportionment; and the power of apportionment is therefore unlimited, unless it be restrained as a part of the power of taxation. The fair inference from this remark would seem to be, that although local assessments for public use may not be in strict consonance with the fundamental principles of free government, and although there may be constitutional restrictions as to the degree or extent to which taxation may be carried, yet, if there be no specific

restriction as to the mode of apportionment, the legislature may, under that purely incidental power, apportion taxation according to any arbitrary rule of its own selection, and in disregard of the fundamental principle of equality and uniformity. The plain mandate of the Constitution cannot be evaded by any such shallow pretext. Our Constitution absolutely requires that "taxation, * * * whether imposed by the state, county, or corporate bodies, shall be equal and uniform, and all property, both real and personal, shall be taxed in proportion to its value, to be ascertained as prescribed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value." Obviously, under the system of taxation thus prescribed, *apportionment* is a necessary incident, and must conform to the system prescribed. Take, for instance, two taxpayers to whom it is ascertained, as prescribed by law, that one of them has $100 worth of taxable property, and the other has property of the taxable value of $1,000, and the uniform rate of taxation ascertained and prescribed by the legislature be fifty cents on each $100 worth of property is it not obvious that, as between the two, the uniform rate upon the basis of value naturally apportions the tax, so that one pays fifty cents and the other five dollars, and that apportionment is purely incidental, and necessarily results from the prescribed system and rate of taxation? How absurd, then, it is to talk about evading a great principle, prescribed by the Constitution, by the arbitrary exercise of the incidental power of apportionment.

Again, in support of his theory of local assessments, notwithstanding its inequalities, Judge Ruggles cites by way of illustration the unequal duties imposed by the general government on imported goods, and says: "The tax on one imported article falls on a large class of consumers, while the tax on another affects comparatively a few individuals. The

duty on one article, consumed by one class of inhabitants, is twenty *per cent.* of its value; while on another, consumed by a different class, is forty *per cent.* The duty on one foreign commodity is laid for the purpose of revenue mainly, without reference to the ability of its consumers to pay; as in the case of the duty on salt. The duty on another is laid for the purpose of encouraging domestic manufacturers of the same article; thus compelling the consumer to pay a higher price to one man than he could otherwise have bought the article for from another. These discriminations may be impolitic, and in some cases unjust; but if the power of taxation upon importations had not been transferred by the people of this state to the Federal government, there could have been no pretence for declaring them to be unconstitutional in state legislation."

This illustration is "far-fetched" and palpably inapt. Whether duties on foreign goods should be imposed for revenue only, or for the protection of domestic manufacturers, are questions upon which the people of this country have been divided from a very early period in the history of our government, and they are yet divided in opinion. These questions have been most elaborately discussed by the leading statesmen of the two great political parties of the nation, each avowedly aiming at the greatest good for the greatest number of our people; and one or the other policy has prevailed as the one or the other of those political parties have acquired the ascendancy; and, whether one or the other policy be the true one, neither party has ever dared to propose to compel the American citizen to purchase the foreign goods thus taxed; while the system of local taxation for public use does proceed upon the ground that, being for a public use, the expense of construction may be raised by taxation, and, having achieved this, the only ground upon which a tax can be justified, the whole burden is imposed upon the abutting owners, and this upon the miserable shift and unwarranted supposition that the properties thus

taxed will, respectively, be benefitted to the extent of the bur-
'den imposed—a thing so palpably incongruous in thought and
expression as to at once stamp it with that character of rank
injustice necessarily attendant upon a proposition so manifestly
absurd.    No such vicious system of taxation can find any sup-
port in the discriminations made by the government in impos-
ing duties on foreign importations.    In the one case the bur-
den is imposed for revenue, or for revenue and incidental pro-
tection.    In the other, the burden is imposed for the erection
or improvement of a public street, sewer, or the like, for the
use of the public at large, but the cost is palmed upon the
few abutting owners, whether they want the so-called improve-
ment or not.    There never was, and never can be, any just
ground for any such system of taxation.

But can the doctrine be justified under the · provisions of
the New York Constitution, as stated by Judge Ruggles him-
self ?    We think not.    After citing several authorities sup-
posed to sustain his view, Judge Ruggles arrives at the con-
clusion that " if the uniform practice of the government of
New York, from its origin, can settle any question of this
nature, the power of the legislature to exercise this kind of
taxation would seem to be established by it.    Constitutional
objections," he says, " never prevailed against .it until 1846,
when the case of *The People* v. *The Mayor, &c., of Brook-
lyn* was decided.    It is," he says, " true, however, that they
were complained of as operating harshly and unjustly in
many instances.    The subject was frequently brought before
the legislature, and was debated in the public press." ·

The learned judge then proceeds to say, in substance, that
the attempt was made in the convention of 1846 to abolish
this mode of taxation ; that a standing committee was ap-
pointed to consider and report on the organization and power
of cities and incorporated villages, and especially on their
power of taxation, *assessment*, borrowing money, contracting

debts, and loaning their credit; * * * that a majority of that committee reported a section " prohibiting *local assessment for any improvement in a city or village, unless upon application of a majority of the owners of the lands to be assessed,* and unless upon a vote of two thirds of the common council or board of trustees." And that the minority reported the following section : " *No assessment for any improvement in any city or village shall be laid otherwise than by a general tax* upon the taxable property of such city or village, levied and collected with an annual tax for other expenses." That both of the propositions thus reported failed, and that the convention adopted the following substitute : " It shall be the duty of the legislature to provide for the organization of cities and incorporated villages, *and to restrict their powers* of taxation, *assessment,* borrowing money, contracting debts, and loaning their credit, *so as to prevent abuses in assessments* and in contracting debt by such municipal corporations."

Commenting on this provision of the New York Constitution, Judge Ruggles says : " Instead of abolishing the system of assessments, this section of the Constitution refers it to the legislature for the correction of its abuses. The direction given to restrict the power of cities and villages to make assessments pre-supposes and admits the existence of a power to be restricted. The Constitution, therefore, in this section, recognizes and affirms the validity of the legislation by which city and village assessments for local purposes like that now in controversy are authorized ; and seems to remove all doubt in relation to the legislative power in question."

This conclusion is singularly illogical and inconsistent with the premises laid down by the learned judge. It is true that the constitutional provision in question referred the subject to the legislature—not, however, to correct abuses merely, but with the express mandate : " It shall be the duty of the legislature to provide for the organization of cities and incor-

porated villages, *and to restrict their powers of* taxation, assessment," &c. This, it is true, presupposed, and, in a sense, admitted, the existence of a power to be restricted. Why so? Simply because theretofore there had been no constitutional restriction imposed, and hence the legislature, the supreme law-making power of the state, in the absence of such restriction, had freely exercised the power in question, and had the right to do so, provided it did not in its exercise subvert the fundamental principles of free government. But this provision in no manner recognized and affirmed the validity of legislation imposing the whole cost of constructing or improving public streets, sewers, and the like, upon the owners of property abutting thereon. On the contrary, the provision is a plain declaration that local assessments for public use had been carried to an extent incompatible with the public good, and become an evil to be restricted ; and hence the mandate, addressed to future legislatures, to restrict it. But, instead of restricting, as commanded by the Constitution, the legislature gave unbridled license to the exercise of the power; and it was this that Judge Ruggles, in the leading New York case, condoned as constitutional and valid. Can it be said that, in the light of the Constitution of New York, fairly interpreted, his conclusion was warranted?

The New York doctrine, which was very generally accepted and followed in most of the states, has nowhere been more severely and justly denounced than it was by Chief Justice Church in the case of *Guest* v. *Brooklyn*, decided by the New York court of appeals twenty-six years after the decision of *The People* v. *The Mayor, &c., of Brooklyn*. In a note to section 761, 2 Dillon's Mun. Corp., the learned author refers to and quotes from the opinion in that case, as follows:

" In the recent case of *Guest* v. *Brooklyn*, 69 N. Y. 506, (1877,) Church, Chief Justice, not denying the power of the legislature to authorize local assessment against the owner's

consent, condemns the system, as authorized and practiced in New York and Brooklyn, as ' unjust and oppressive, unsound in principle, and vicious in practice. The right to make a public street is based upon public necessity, and the public should pay for it. To force an expensive improvement (against the consent of the owners, or a majority of them) upon a few property-owners, against their consent, and compel them to pay the entire expense, under the delusive pretense of a corresponding *specific* benefit conferred upon their property, is a species of despotism that ought not to be perpetuated under a government which claims to protect property equally with life and liberty. Besides its manifest injustice, it deprives the citizen practically of the principal protection (aside from constitutional restraints) against unjust taxation—viz., the responsibility of the representative for his acts to his constituents. As respects general taxation, where all are equally affected, this operates; but it has no beneficial application in preventing local taxation for public improvements. The majority are never backward in consenting to, or even demanding, improvements which they may enjoy without expense to themselves.' "

In thus examining into the system of local assessments, we have confined ourselves to the principles laid down in *People* v. *Mayor, &c., of Brooklyn*, that being the leading case on the subject, and the one uniformly referred to by the courts which have adopted and followed the rule laid down in that case. In the light of the authorities referred to as opposed to that doctrine, and in the light of reason and principle, it would seem to be impossible for any impartial mind to regard it in any other light than that of the parent of great inequality, injustice, and oppression—a doctrine which amounts to a monstrous evil wherever enforced, and one that is, in every just sense, repugnant to the Virginia Constitution, which declares that "taxation, * * * whether imposed by

the state, county, or corporate bodies, shall be equal and uni-
form, and all property, both real and personal, shall be taxed
in proportion to its value, to be ascertained as prescribed by
law. No one species of property from which a tax may be
collected shall be taxed higher than any other species of
property of equal value." This specific, mandatory provision
of our Constitution provides a system of taxation which is the
nearest possible approximation to absolute equality, uni-
formity, and justice; while the system of local taxation for
public improvements is a system of inequality, injustice, and
oppression. It has not one redeeming feature. Speaking of
and condemning this system, Chief Justice Church, in *Guest*
v. *Brooklyn, supra,* said: " The inevitable consequence is, to
induce improvements in advance of public necessity, to cause
extravagant expenditures, fraudulent practices, and ruinous
taxation. The system operates unequally and unjustly, and
leads to oppression and confiscation. It is difficult to dis-
cover in it a single redeeming feature which ought to commend
it to public favor."

Notwithstanding the language of the Constitution above
quoted, the legislature, by the 25th section of chapter 3 of
the charter act of the city of Norfolk, provided : " Whenever
any street shall be laid out, a street graded or paved, a cul-
vert built, or any other public improvement whatsoever made,
the city councils may determine what portion, if any, of the
expense thereof ought to be paid from the public treasury,
and what portion by the owners of real estate benefitted, or
may order and direct that the whole expense be assessed upon
the owners of real estate benefitted thereby. But no such
public improvement shall be made, to be defrayed, in whole or
in part, by a local assessment, until first requested by a peti-
tion, signed by a majority of the owners of property to be
assessed for such improvement, or unless the councils shall, by
a vote of a majority of all the members elected to each council,

declare the said improvement to be expedient; and shall, furthermore, give public notice of such resolution in two or more newspapers published in said city, for twenty days, and shall thereafter, by a like majority vote, order that the said improvement shall be made."

By this provision of the charter extensive and most important legislative power is, in specific terms, attempted to be conferred upon the municipal authorities of Norfolk city. In view of the constitutional prescription above referred to, it would seem too plain for argument that the legislature itself had no such power, and could not, therefore, confer it upon the municipal authorities of said city. The power is not only opposed to the very letter of the Constitution, but is, in the nature of things, an extensive and dangerous power, which the framers of the Constitution would never have granted except in express terms, and subject to such specific restrictions as to securely guard the citizen against its abuse. Observation and experience teaches that in many instances the councils of cities and incorporated towns are to a large extent composed of irresponsible persons, who own little or no property, have no just appreciation of the burdens of taxation, and are too liable to be swayed, unconsciously it may be, by interested or corrupt influences, adroitly brought to bear upon them, and induced to order public improvements, the expense of which, if imposed upon the abutting owners, must necessarily result in ruinous consequences to them. How easy it would be, with the too-frequent irresponsible character of the majority of a city council, for designing speculators, or corrupt jobbers, to bring about improvements, ostensibly for the public good, but really for their own unworthy purposes of gain, which would in many instances impose a burden, in the shape of local taxation, which would amount to practical confiscation. Take the case of a day laborer, mechanic, citizen, or business man of small means, who, by industry and

frugality, has succeeded in purchasing a lot on some established street in a city or incorporated town, and has erected thereon a plain and humble dwelling—his house, his all; and by influences, such as are too often brought to bear upon city and town councils, an expensive improvement of the street is either injudiciously or corruptly ordered, and the property-holder is subjected to a local tax for such improvement, equal to, or in excess of, the fair market value of his property, and upon no other ground than the unreliable conjecture that he will be benefitted by the improvement to the extent of the burden thus imposed. In such case (and there are many such) is it not obvious that the property must be sold to discharge the tax, and that, in all probability, the speculator, or corrupt jobber, will become the purchaser at a price but little, if anything, in excess of the local tax imposed, and the victim of this vicious system of taxation be left houseless and homeless, with the miserable consolation that, although without home or shelter, he is rich in supposed benefits which never were and never could have been reasonably expected to be realized. The system, or any system so readily open to such abuses, is opposed to every principle of natural justice, and is flatly in the teeth of our Constitution, which declares that taxation, whether imposed by the state, county, or corporate bodies, shall be equal and uniform, and upon the basis of value.

In view of this express and unequivocal mandate of the paramount law, it is incomprehensible how it could ever have been contended that the provision in question applies only to taxes levied for purposes of state revenue. The Constitution cannot be evaded by any such specious interpretation. It is, too, worse than vain and idle to pretend that the system of local taxation for public improvements is a system of equivalents; that it imposes the tax according to the maxim, that he who receives the benefit ought to bear the burden; or that it aims to exact from the abutting owner no more than his just

share of the burden, according to an equitable rule of apportionment. ˙ The whole system, and its every feature, is opposed to equality and uniformity, is diametrically opposed to every principle of equitable apportionment, and, so far from being legitimate taxation, is arbitrary exaction in its most odious form. After careful and laborious investigation, we are fully convinced that the doctrine held in the leading New York case of *The People* v. *The Mayor, &c., of Brooklyn, supra,* and in numerous cases in most of the states, following it, cannot be sustained upon either reason or principle, and is opposed to the very letter, as well as the spirit, of our own Constitution.

This view, though directly adverse to the system of local taxation in question, is not, however, expressed with the view of now declaring the said 25th section of the charter of Norfolk city, conferring upon the councils of said city authority ˙ to levy such taxes, unconstitutional and void. Nor is it our purpose now to reverse the doctrine held by this court in *Norfolk City* v. *Ellis, Sands* v. *City of Richmond,* and *Davis* v. *City of Lynchburg, supra.* Indeed, it is not necessary to the proper decision of the questions arising in the present case, either to declare unconstitutional and void said section 25 of the charter of Norfolk city, or to reverse the doctrine of the said decisions of this court; although, if it were absolutely necessary to a proper decision of the present case, we must admit that we know of no ground upon which we could decline to hold said provision of the charter unconstitutional and void, which would involve the overturning of the doctrine of the aforesaid decisions of this court. But we do hold that the doctrine of these cases, which are readily distinguished from the present case, must not be extended, but limited to precisely similar cases. They were all paving cases, and substantially the same principles were involved, and the same doctrine applied, in each. In each of them the conditions precedent imposed by the charter

VOL. LXXXIX—31.

and ordinances were strictly complied with before the local assessment or tax was imposed. But in the present case such conditions were not complied with. Here the city of Norfolk, having failed to acquire, by purchase or by agreement with the owners, the lands necessary for the proposed improvement, and without any petition from a majority of such owners for the construction of the improvement, were forced to resort to condemnation proceedings, under sections 6 to 10 of chapter 56, Code 1873, and section 22 of chapter 3 of the charter of said city.

The commissioners appointed under the condemnation proceedings, upon a view of the appellee's lot, and such evidence as was before them, ascertained and reported to court that of the appellee's lot, fronting twenty-three feet on Granby street, and running back thirty-nine feet to Concord street, it was necessary to take ten feet of said frontage on said Granby street, and running back as aforesaid, and that, for the part so taken, and for the damage to the residue thereof *beyond the peculiar benefits to be derived in respect to such residue from the work to be constructed,* the appellee was entitled to $1,200 as a just compensation therefor. This report was confirmed by the court on the 18th of March, the money so awarded was paid into court, and by an order of said court was paid to the appellee; and in this way the city of Norfolk acquired title to the portion of the appellee's lot thus taken. Long afterwards, by the proceedings already set forth, the councils of said city appointed a committee to assess the betterments to the property along the line of the proposed improvement; and on the 29th of June, 1886, the committee made its report to the common council, and on the next day, June 30th, 1886, it reported to the select council, and on those days, respectively, the report was adopted by said councils. By this report, among other things, the appellee was assessed with $1,500 for betterments, a sum $300 in excess of the sum awarded him as

just compensation, under the condemnation proceedings; and this second assessment for betterments is the subject of controversy in this suit.

Recurring now to the question, What was the effect of the condemnation proceedings had in this case? and bearing in mind that the Constitution of Virginia provides that "the general assembly shall not pass any law whereby private property shall be taken for public uses without just compensation," and keeping also in view the provisions of section 6–10 of ch. 56, Code 1873, which prescribe the mode of condemning lands needed for such uses, where the same cannot be acquired by agreement with the owners, and comparing these provisions with the charter of the city of Norfolk, it will be readily perceived that said city was without any authority, either constitutional or statutory, to make the assessment for *betterments* here in question.

By the provisions of ch. 56, Code 1873, above referred to, the commissioners appointed to condemn lands for public uses are directed and required, after viewing the land and hearing evidence, to ascertain what will be a just compensation for such land, and the damages to the residue of the tract beyond the peculiar benefits to be derived in respect to such residue from the work to be constructed. The owner is entitled under the statute to receive (1) a just compensation, *in money*, for the value of the land taken, without any set-off whatever; and (2) to damages also to the residue of the tract beyond the peculiar benefits to be derived in respect to such residue from the improvement. These peculiar benefits may be set off against such damages; but the difference, if any, in favor of the benefits, can not be set off against the value of the land, nor against the owner. These principles were distinctly laid down and definitely settled by this court in *Mitchell* v. *Thornton*, 21 Gratt. 164, and have not since been brought in question. See, also, *Vanhorne* v. *Dorrance*, 2 Dallas 304; Mills Em. Domain, § 135; 2 Dil. Mun. Corp., § 738.

It is, therefore, manifest that, under the settled law of this state, the value of the land taken for public use cannot be compensated to the owner in *benefits* to the residue of the tract, but the compensation—the fair value of the land at the time—must be made *in money*.

The authority of the city of Norfolk to condemn land for public use is conferred by section 22, chapter 3, of the city charter, which corresponds with the general law of the state, and provides for resort to condemnation proceedings in the event of failure to acquire the requisite land by agreement; and this was the method resorted to by the city of Norfolk in the present case, and with the result already stated. But after the condemnation proceedings, as authorized by law, and after the land-owners along the line of the proposed improvement had received the amounts respectively awarded them as just compensation, the councils of said city, with the avowed purpose of replenishing its treasury to the extent of the compensation paid to said land-owners, directed, and had made, an assessment for *betterments* to the residue of said properties; and in this proceeding the appellee here, who was one of said land-owners, was assessed with the sum of $1,500; thus taking back from him, under the specious pretext of imaginary peculiar benefits (betterments), not only the entire sum of $1,200 awarded him as just compensation for that portion of his land actually taken, but $300 in excess thereof. Is it not difficult to conceive a case of grosser injustice and oppression, or one more palpably opposed to both the letter and spirit of the Constitution and laws of this commonwealth? In proceeding to condemn that portion of the appellee's land which was taken for public use, the whole question of peculiar benefits, or betterments, to the residue of his lot, was involved, and was finally disposed of; and in that proceeding the city of Norfolk received and appropriated all that she was then, or ever can be, entitled to on the score of pecu-

liar benefits to the residue of said property. The provision of the statute is mandatory that the commissioners appointed in condemnation proceedings shall, after viewing the land and hearing evidence, ascertain what will be a just compensation, not only for the land taken, but also for the damages to the residue of the tract *beyond the peculiar benefits* to be derived in respect to such residue from the work to be constructed.

In the present case, the commissioners reported that for the land of the appellee taken, and for damages to the residue of the tract, *beyond the peculiar benefits*, he was entitled to $1,200 as just compensation; and this report, as before stated, was confirmed by the court, and the compensation thus ascertained was paid to the appellee; but the city now seeks to take back this compensation under the specious plea of an additional special assessment for betterments to the residue of said property. If the city can make such second assessment for peculiar benefits, or betterments, it may with equal propriety be repeated an indefinite number of times, the result of which would be practical confiscation and the sweeping away of the constitutional guaranties of the right of property.

But, for its authority to make this second assessment for *peculiar benefits*, the city relies on the 25th section of its charter act, which, as before stated, provides that " whenever any street shall be laid out," &c., " the councils may determine what portion, if any, of the expense ought to be paid from the public treasury, and what portion by the owners of the real estate benefitted thereby, or may order that the whole expense be assessed upon said owners."

These sections of the city charter (22 and 25) are *in pari materie*, and must be construed together, so as to give effect to said section 22, which, as above stated, corresponds with the general law, as laid down in sections 6–10, ch. 56 of the Code of 1873, and provides that the councils shall not take or

use any private property for streets or other public purposes, without making the owners just compensation therefor ; and that in case of inability to agree with the owners for the purchase thereof, shall resort to the condemnation proceedings provided by said chapter 56.   The reason of this provision is obvious.   It was not in the power of the legislature to authorize the city to take private property for public use without just compensation ; and hence the restriction contained in said 22d section, which is in accord with the plain mandate of the Constitution and general law.   It is, however, palpable that the assessment here in question is but an attempt on the part of the city of Norfolk to set off such assessment against the value of the property taken for its purposes from the appellee ; or, in other words, an attempt to effect by indirection what, by the Constitution and general law of the state, is forbidden to be accomplished by direct methods.   The 25th section of the city charter confers no authority for any such system of special assessments for *peculiar benefits.*   With respect to said section it may be remarked, (1) that the object of the legislature was to confer upon the councils of said city ample legislative authority with respect to the construction of public improvements within the municipality, and (2) to invest said councils with large discretionary powers in respect to the expense of any such improvement; and hence the provision that said councils should determine what portion, if any, of the expense ought to be paid from the public treasury, and what portion by the owners of the real estate benefitted, and further to determine and direct that the whole expense be assessed upon the owners of real estate benefitted thereby. Such is the effect of the first clause of said section.   The second clause thereof imposes certain conditions precedent essential to the valid exercise of the rights and powers conferred by said first clause, as follows : " But no such public improvement "—that is, any improvement comprehended by

said first clause—"shall be made, to be defrayed, in whole or in part, by a local assessment, until first requested by a petition, signed by a majority of the owners of property to be assessed for such improvement, or unless the councils shall, by a vote of a majority of all the members elected to each council, declare the said improvement expedient; and shall, furthermore, give public notice of such resolution in two or more newspapers, published in said city, for twenty days, and shall thereafter, by a like majority vote, order and determine that the said improvement shall be made."

The plain meaning of the requirements of this 25th section of the charter is, that improvements, such as are contemplated in the said first clause, if petitioned for as therein provided, may be declared expedient, and an order made for their construction.    But, in the absence of such petition, three things are essential to the validity of a local assessment for any such public improvement: 1st. That the councils shall, by a majority vote, &c., declare the improvement to be expedient.    2d. That notice shall be published for twenty days in two or more newspapers, &c.    3d. That by a majority vote of all the members elected to each council, after the two preceding requirements, it shall order and determine that the improvement be made.

It is not enough that the councils declared the improvement to be expedient, and gave notice of that resolution by publication.    It is essential that notice be given, by the required publication, that the expense of the contemplated local improvement is to be defrayed, in whole or in part, by a local assessment upon the owners of the lands to be benefitted thereby.    In the present case, the mode of defraying the expense of the improvement was the subject of municipal legislation, and the matter of prime importance to those for whom the notice was intended; for, by the mere notice of the fact that the councils had resolved that the improvement was expedient, the local owners were not put on their guard and

warned to protect their interests, as they would have been by notice that they were to be assessed with and required to pay the whole expense of the improvement.

Moreover, it is a well-settled principle, that was intended by said section 25 of the city charter to be recognized and respected, that all those whose rights are to be directly affected shall be allowed notice and an opportunity to appear and be heard in defense of those rights; and any mode of procedure without such notice and opportunity would, in cases like the present, afford a municipal corporation ready means of bringing about a virtual confiscation of the citizen's estate.

It is obvious that, so far from there being in said section 25 anything authorizing the assessment in question, the method of assessment attempted by said city is unauthorized thereby, and is opposed to the very letter and spirit thereof. In any view of the subject, it is too plain to need argument that there is no express authority in said section of the charter for repeated assessments for *betterments*, or, what is the same thing, *peculiar benefits*, to that portion of the citizen's property not taken; nor is there anything from which any such authority may be implied.

No more cogent argument against the injustice and oppression incident to the mode of local assessment for betterments, attempted by the municipal authorities of the city of Norfolk, can be adduced than the practical result to the appellee in the present case. His was a vacant lot, on the corner of Granby and Plume streets, fronting twenty-three feet on the former, and running back thirty-nine feet to Concord street. The proposed improvement is to widen and extend Plume street, the present width of which is fifty feet. With this street, as then established and used, and as it had been for a great many years, the abutting land-owners seem to have been satisfied; and hence they refused to sell the land required by the

city for the improvement, and the city thereupon resorted to the condemnation proceedings provided by law. And, after viewing the property and hearing evidence, said commissioners ascertained, that for the land taken, which was a strip fronting ten feet on Granby street, and running back as aforesaid, and for damages to the residue of said lot, over and above the *peculiar benefits*, the appellee was entitled to $1,200 as just compensation. They did not report specifically the amount of damage to the residue, nor the amount in value of the *peculiar benefits*. That they did not do so can only be accounted for on the ground that they made a lumping business of it—considered the damages to the residue and the *peculiar benefits* as equal, and set off the one against the other; and thus ascertained the $1,200 as just compensation for the part actually taken. As this seems the only intelligible way of arriving at the basis of their conclusions, it would seem to follow, that the commissioners estimated the value of the whole lot, fronting twenty-three feet on Granby street, and running back thirty-nine feet to Concord street, at $2,760, or $120 per front foot, which rate makes the $1,200 ascertained and paid as just compensation for the land taken.

By thus reducing the frontage of the appellee's lot from twenty-three to thirteen feet, the residue is rendered comparatively unfit for improvement for either business or residential purposes; for, after allowing for the usual thickness of walls, in the event of building thereon, there would be left barely the space of ten feet for occupation. It goes, therefore, without saying, that, so far from there being any *peculiar benefits* to the residue of said lot, the same is, in the nature of things, very greatly damaged; and it is obvious that the commissioners, in off-setting such damages with the imaginary *peculiar benefits* which they supposed would result to said residue from the proposed improvement, imposed upon the appellee a burden which, in all probability,

was far in excess of anything the city was entitled to demand.

In the light of common experience and observation, it is but fair to assume that, under the peculiar circumstances of this case, the residue of the appellee's lot was damaged in the ratio of its decreased frontage, which would reduce the value of said residue to about $871, or less by $689 than the assessment for betterments here in question. If, therefore, this assessment could be even tolerated, the result would be that the appellee, under a forced sale, has been compelled to part with 10-23ds of his lot for the consideration of $1,200, and to pay this assessment of $1,500 on the residue of his property, which assessment exceeds the value of said residue by the sum of $689; or, to state it differently, the appellee would be compelled to part with his lot, worth $2,760, for the paltry consideration of $1,200, and to pay a bonus of $689 for the privilege of being thus victimized.

There is yet another view of the subject, which is not so extremely repulsive as that taken above, but yet sufficiently so to fully exemplify the gross injustice and oppression on the part of the city of Norfolk in attempting to impose this second special assessment upon the appellee for pretended *betterments* to the residue of his lot. In the answer of the city of Norfolk to the appellee's bill, it is stated that the $1,200 was awarded to the appellee as compensation for the land taken from him. This being so, it necessarily follows that the commissioners for condemnation treated the benefits to the residue as equal to the damages thereto, and simply set off the one against the other. Then, as the ten-foot strip taken by the city for public use was valued at $120 per front foot, making the gross sum of $1,200 for the part so taken, the residue of thirteen feet was, of course, at the same rate per front foot, worth just $1,560; from which sum subtract $1,500, the amount of the assessment here in question, and there is left of the value of said residue only the sum of $60, to which

add the sum of $1,200, received by the appellee for the portion of his lot which was taken by the city, making $1,260, the entire amount left to him of a property worth $2,760.    And this monstrous result flows from a second assessment for pretended *peculiar benefits* to the residue of appellee's lot, when the assessment absorbs the entire value of that residue except $60.

Whether the one or the other of the two views last above expressed be taken as the true one, we have presented to our view a plain case of virtual confiscation, which has no sanction either in the general law of the State or in the charter of the city of Norfolk.

It only remains to consider one other question : Was the assessment in question made in conformity with the charter and ordinances of said city ?

It sufficiently appears, from what has already been said in discussing the 25th section of the city charter, that the proceedings had by the municipal authorities of said city were not in accordance with the charter act of said city, or with any provision thereof.

Moreover, there seems to have been in force a special ordinance of said city regulating local assessments for public improvements, to which the action of the councils should have conformed, but did not.    Section 44, p. 113, of the city ordinances, provides that whenever a street shall be laid out, &c., the councils shall order a local assessment upon the owners benefitted thereby in the manner prescribed by said section 25, and it shall be made as follows :  One half to be paid by said owners—that is, one fourth by the owners of real estate on each side of said street, to be charged on the basis of frontage.   And said section contains also this provision : " And this proportion shall be the rule in making local assessments, unless the councils shall especially otherwise determine in their order directing any improvement to be made."

This 44th section had not been repealed, nor did the order directing the improvement in question to be made—to-wit, the order of December 2d, 1884—"especially otherwise direct." It is, therefore, indisputable that, in the proceedings had by said councils in making said assessment, they did not comply with said section 44, in that they did not assess only one half of the expense against the local owners, as prescribed thereby, and in that they did not make it on the basis of frontage.

For these reasons, we are of opinion that the decree appealed from is without error, and the same must be affirmed.

LEWIS, P., and HINTON, J., concurred in the results.

DECREE AFFIRMED.